AO 91 (Rev. 11/11)  Criminal Complaint

| LODGED | | FILED |
| --- | --- | --- |
| CLERK, U.S. DISTRICT COURT | **UNITED STATES DISTRICT COURT** | CLERK, U.S. DISTRICT COURT |
| 06/01/2021 | for the | 06/01/2021 |
| CENTRAL DISTRICT OF CALIFORNIA | Central District of California | CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___DM___ DEPUTY | | BY: ___GR___ DEPUTY |

|  |  |  |
| --- | --- | --- |
| United States of America | ) | |
| v. | ) | |
|  | ) | Case No. 2:21-mj-02678 |
| EDGAR HERNANEZ LEMUS | ) | |
| and | ) | |
| FRANCISCO JAVIER HERNANDEZ MARTINEZ | ) | |
|  | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   beginning unknown date to 5/31/21   in the county of   Los Angeles   in the

Central District   District of   California  , the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. 1956(h) | Money Laundering Conspiracy |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Caitlin Bowdler
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   June 1, 2021

Karen L. Stevenson
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Karen L. Stevenson
_____
*Printed name and title*

*AUSA:* Jeffrey M. Chemerinsky

**AFFIDAVIT**

I, Caitlin Bowdler, being duly sworn and under oath, hereby depose and say:

## I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2017.  I am currently assigned to the Los Angeles Field Division Violent Crime Squad which is responsible for investigating kidnappings, extortion, bank robberies, Hobbs Act violations, and other violent crimes.  During the time I have been employed by the FBI, I have also worked on a white-collar crime squad.

2.    Since becoming an FBI Special Agent, I have received formal training at the FBI Training Academy in Quantico, Virginia.  This training included segments on conducting criminal investigations, narcotics identification, organized crime, and other law enforcement topics.  During the time I have been employed by the FBI, I have participated in investigations relating to extortion, cybercrimes, wire fraud, money laundering, identity theft, murder-for hire, kidnappings, and various types of financial institution fraud and violent crimes. I have participated in many aspects of criminal investigations, such as, but not limited to, reviewing evidence, the issuance of subpoenas, the analysis of pen and trap and trace records, consensually monitored telephone calls, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

## II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, EDGAR ADRIAN HERNANDEZ LEMUS ("LEMUS") and FRANCISCO JAVIER HERNANDEZ MARTINEZ ("MARTINEZ"), for violation of 18 U.S.C. § 1956(h) (Money Laundering Conspiracy). This affidavit is also made in support of search warrants for the following:

      a.  A 2002 Ford Truck with California license plate 46428L1, VIN 1FTRW07622KD61463 (the "SUBJECT VEHICLE"), as described more fully in Attachment A-1;

      b. The person of LEMUS, as described more fully in Attachment A-2;

      c. The person of MARTINEZ, as described more fully in Attachment A-3.

4.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1956(h) (Money Laundering Conspiracy); 18 U.S.C. § 1951 (Hobbs Act Extortion conspiracy); and 18 U.S.C. § 1203 (Hostage Taking Conspiracy) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A-1, A-2, and A-3 and B are incorporated herein by reference.

1.    This affidavit is also made in support of an application for a warrant authorizing the installation, use, monitoring, and maintenance of a Global Positioning System ("GPS") tracking device on the SUBJECT VEHICLE.  Based on the facts set forth below, there is probable cause to believe that the SUBJECT VEHICLE is being used to facilitate violations of

the SUBJECT OFFENSES.  Further, as explained below, there is
probable cause to believe that the use of a GPS tracking device
on the SUBJECT VEHICLE would provide evidence of these crimes,
including, but not limited to, information regarding individuals
and locations the SUBJECT VEHICLE visits.

5.   The information set forth in this affidavit is based
upon my participation in the investigation, encompassing my
personal knowledge, observations, training and experience, as
well as information obtained from my review of investigative
reports, and interviews and debriefings with other participating
law enforcement.  This affidavit is intended to show merely that
there is sufficient probable cause for the requested complaint
and warrants and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   Law enforcement is investigating a series consisting
of at least five kidnappings for ransom.  All incidents appear
to be linked based on a common modus operandi, to include common
locations used, common phone numbers used to place calls, and
similar ransom demands.  Specifically, each of the incidents
target victims who are waiting or attempting to cross the border
into the United States.  The incidents each involve the
kidnappers holding victims for ransom and insisting on ransom
payments from the kidnapped-victim's family members in order to

release the kidnapped-victim.  The kidnappers use specific sections at Walmart stores to meet with the family members to collect the ransom payments.  After the payment is made, however, rather than releasing the kidnapped-victim, the kidnappers demand additional money.

7.   As described further below, law enforcement has identified LEMUS and MARTINEZ as two individuals that either picked up or received ransom proceeds from kidnapped-victim's family members.  Specifically, LEMUS and MARTINEZ match the individuals captured on video surveillance footage during the ransom drops and seen by agents during a May 31, 2021 ransom drop.  Moreover, the vehicle driven for the second and third ransom pickup, that is, the SUBJECT VEHICLE, is a vehicle that law enforcement has identified and surveilled LEMUS driving.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Kidnapping of M.L.A.

#### 1.   <u>Kidnapping</u>

8.   On April 21, 2021, the FBI received a report of a kidnapping for ransom from the Southgate Police Department. Southgate Police Department informed the FBI that A.C. had reported that on approximately April 18, 2021, his wife, M.L.A., a Mexican Citizen, had been kidnapped.

9.   I interviewed A.C. on April 21, 2021 and learned that he had last spoken with M.L.A. on April 18, 2021 when M.L.A. called from her phone (phone number ending in 1423).  M.L.A. stated that she was staying at a hotel in Mexicali and had found a coyote to get her across the border to the United States.  The

coyotes did not ask her to pay money or make a deposit prior to the crossing.

10.   A.C. began receiving text messages stating that it would cost $19,000 to release M.L.A.  The hostage takers sent A.C. instructions to go to a Walmart, located at 4651 Firestone Blvd, South Gate, California 90280, and meet someone in the electronics section of the store.  According to the hostage takers, that individual would meet A.C. at the electronics section and pick up money from him.  A.C. was told not to follow this individual outside the store.

11.   A.C. arrived at the Southgate Walmart on April 20, 2021, at approximately 2:00 p.m.  When he arrived at the Walmart, A.C. received a phone call from the kidnappers asking what he was wearing and if he was by himself.  He was told not to take a video of the meeting, not to follow the person, and not to hang up the phone, as the hostage takers had his wife outside.

12.   A.C. went inside the Walmart to the television section where a man approached him.  A.C. gave the man a plastic bag filled with cash for M.L.A.'s release.  A.C. described the man as 5'6", short hair, 170-180 lbs, darker skin, wearing a long sleeve gray shirt and blue jeans.  After A.C. gave the man the money, he looked for M.L.A. inside and outside the store, but could not locate her.  He went outside the Walmart to look for the man he just gave the money to, but also could not find anyone.

13.   A.C. received a call after the Walmart exchange from a man, who identified himself as "Octavio" and who stated he was in Mexicali.  Octavio told A.C. that A.C.'s payment was short $1,500 because M.L.A. had mixed liquid with cocaine, so he owed extra money for that.  Octavio told A.C. that he would be charged additional money for each day that the money was not paid.  A.C. received a call on April 21, 2021 from the 442-226-0674 number asking for more money or his wife would be tortured. He also received phone calls from 760-587-3665.

14.   After A.C. told the kidnappers that they had made him crash his car and he was in the streets begging for more money, they stopped calling him.  M.L.A. was released in Mexicali on the evening of April 22, 2021.

15.   I interviewed A.C. and M.L.A. on April 24, 2021 and learned that M.L.A. had met a woman "Daniella" at a hotel in Mexicali.  According to M.L.A., Daniella connected her with a coyote who would cross her for $14,000.  However, rather than cross her into the United States, the hostage takers, held her at gunpoint.  While M.L.A. was held hostage, the hostage takers held a gun to her head when she was put on the phone with A.C. The hostage takers also raped and beat her.  She was taken to a two-story house where she was held until her release.

2.   Information Provided by Walmart Corroborates A.C.

16.   On April 21, 2021, I contacted Matt Walsh, Director of Data Analytics at Walmart, to obtain surveillance footage for the payment made by A.C. on April 20, 2021.  Walsh confirmed that based on surveillance footage someone wearing a green-

striped shirt, later identified by A.C. as himself, appeared to meet with an unknown male wearing a long sleeve grey shirt and jeans. Walsh also confirmed that on video, A.C. is seen handing a bag to this person.

17. Walmart provided images of A.C. entering Walmart at approximately 2:12 p.m. and images that showed A.C. meeting with the unknown male at approximately 2:17 p.m. in the television section where a white plastic bag was exchanged.

18. The unknown male, who received the white plastic bag from A.C., was seen exiting Walmart at approximately 2:19 p.m.

19. On April 24, 2021, I showed the surveillance photos to A.C. and he confirmed that he was the individual in the photo in the green-striped shirt, and the man wearing the long sleeve shirt and jeans was the individual he provided the cash to on April 20, 2021. As described below, I believe this unknown male who received the cash from A.C. is LEMUS.

**B.    Kidnapping of E.C.C.**

20. On May 26, 2021, the Santa Barbara County Sheriff's Department ("SBCSD") received a report of a hostage taking for ransom from the victim's husband. The following day, the SBCSD referred the matter to FBI Los Angeles. The following information was gathered from multiple interviews with J.L.D.O. on May 26 and 27, 2021, by the SBCSD and the FBI.

1.    J.L.D.O. Makes Arrangements for His Wife to
      Reunite with Him in the United States

21. On May 26, 2021, SBCSD deputies interviewed J.L.D.O. at his residence in Santa Barbara. J.L.D.O. informed the

deputies that his wife, E.C.C., was living at a hotel in Mexicali to be closer to J.L.D.O. as they figured out how to reunite in the United States.

22.   J.L.D.O. stated that on May 24, 2021, E.C.C. met a woman named "Vanessa" at the hotel who claimed that she knew a "coyote" that could get E.C.C. into the United States.   E.C.C. then reached out to J.L.D.O. and told him about "Jose," whom she would have to pay $12,000 to cross the border.   J.L.D.O. had already been saving money to bring his wife across the border, so he agreed to pay.

23.   On May 25, 2021, at approximately 8:00 p.m. PST, E.C.C. messaged J.L.D.O. via WhatsApp and said that she was on her way to the United States.   J.L.D.O. sent a response but has not heard from E.C.C. since.

### 2.   Kidnapping and Ransom

24.   On May 26, 2021, at approximately 8:00 a.m. PST J.L.D.O received messages from "Jose" on WhatsApp instructing him to bring $15,000 USD to a Walmart located at 14501 Lakewood Boulevard, Paramount, California.   J.L.D.O. had to borrow money from other people to get the entire $15,000.

25.   J.L.D.O.'s brother drove him from Santa Barbara County to the Walmart in Paramount, where Jose instructed them to park in front of the La Michoacana Ice Cream store.   Once parked, J.L.D.O. was instructed over the phone by Jose to go inside Walmart and proceed to the television section.   J.L.D.O. met with an individual he believed to be Jose and handed Jose three envelopes that collectively contained $15,000.

26.   J.L.D.O. described Jose as a Hispanic male, approximately 5'11" tall, wearing a blue COVID-19 mask, a blue sweatshirt, and jeans.  Jose instructed J.L.D.O. to wait inside Walmart until Jose was to count and confirm that all the money was there.  Approximately five minutes later, Jose called J.L.D.O. and told him that E.C.C. would be waiting for him at J.L.D.O.'s vehicle.

27.   E.C.C. was not waiting outside of the vehicle and J.L.D.O. attempted to call Jose multiple times, but Jose did not answer.  Approximately 45 minutes later, Jose texted J.L.D.O. stating that there was a problem and that E.C.C. and another women broke a package that cost $32,000.  Jose told J.L.D.O. that he would need to pay another $16,000 before they would release his wife.

28.   J.L.D.O. and his brother stayed at the Walmart for approximately two more hours before returning to Santa Barbara. After returning to Santa Barbara, J.L.D.O. began to receive messages from Jose instructing him to contact Jose when he had accumulated all of the money.  Jose told J.L.D.O. that as long as J.L.D.O. did everything right, things would turn out okay.

29.   On May 26, 2021, at approximately 6:00 p.m. PST J.L.D.O. was able to convince Jose to put E.C.C. on the phone. J.L.D.O. recognized his wife's voice and she confirmed that she was okay and that she was about to be released at Walmart earlier that day when the kidnapper's noticed that a block of what E.C.C. believed to be drugs was broken.  J.L.D.O. spoke to

his wife for approximately one minute before Jose got back on the phone and repeated that J.L.D.O. needed to get the money.

30.   On May 26, 2021, at approximately 10:30 p.m. PST, Jose messaged J.L.D.O. via WhatsApp stating that if J.L.D.O. delayed paying for the damages to the "white blocks," E.C.C. would be beaten, and a video would be sent to J.L.D.O. as proof. J.L.D.O. interpreted the "white blocks" as a reference to cocaine.

### 3.   Information provided by Walmart

31.   I contacted the Walmart in Paramount on May 27, 2021 to obtain surveillance footage of the transaction between J.L.D.O. and the unidentified male.

32.   Walmart provided images that showed the unidentified male arrived at Walmart in the SUBJECT VEHICLE at approximately 3:02 p.m.  The male was captured by video inside the Walmart at approximately 3:07 p.m.

33.   At approximately 3:15 p.m. J.L.D.O. appeared to give an envelope to the unidentified male in the television section of the Walmart.

34.   At approximately 3:17 p.m., the unidentified male is seen leaving the Walmart.  I could see, in his pant pocket, what appears to be a bulge consistent with the bank envelope that J.L.D.O. described putting the money in.

35.   At approximately 3:18 p.m., the unidentified male is seen getting into the passenger seat of the SUBJECT VEHICLE.  On the surveillance video, the vehicle's make, model, and license plate, 46428L1, are all clearly visible.  As set forth below, I

believe the individual who collected the proceeds for this incident is MARTINEZ.

### 4.  Identification of LEMUS and MARTINEZ

36.  On May 27, 2021 SA Chris McElroy ran the SUBJECT VEHILCE (i.e., license plate 46428L1), and determined that the vehicle was a 2002 Ford F150 with the VIN 1FTRW07622KD61463, registered to MARTINEZ, at 2139 E 117th St, Los Angeles, California 90059.

37.  I reviewed the criminal record information for MARTINEZ and learned that he had been arrested on February 15, 2021 for money laundering by Gardena Police Department.

38.  I received the arrest report for MARTINEZ from Gardena Police Department.  MARTINEZ, LEMUS and a third individual ("J.M.") were stopped on February 15, 2021 for driving without their headlights on in a Nissan Mazda.  A Gardena police officer noticed a rear passenger, who was sitting behind the driver seat, reached underneath the driver side seat twice, as if he was attempting to hide something.  When officers conducted a vehicle search, they found a red grocery bag with large amounts of U.S. currency.

39.  Photos of LEMUS and MARTINEZ's identification cards were attached to the report, as well as booking photos.

40.  Based upon a comparison of the photographs, I believe LEMUS and MARTINEZ were the males who met with victims A.C. and J.L.D.O. separately to receive the ransom money at the Southgate and Paramount Walmart.  Specifically, the photograph of LEMUS is consistent with the individual who collected the ransom proceeds

on April 21, 2021 and May 31, 2021 and the photograph of
MARTINEZ is consistent with the individual who collected the
ransom proceeds on May 26, 2021.

41.   Pursuant to the arrest on February 15, 2021, Gardena
Police Department also seized the cellphones of MARTINEZ and
J.M.

42.   Based on the police report, LEMUS provided a cellphone
number of 619-930-0379 to the officers.  SA Michael Fukuda
submitted an Emergency Disclosure Request to T-Mobile for
LEMUS's phone on May 28, 2021.  T-Mobile provided subscriber
information and pings for this phone.  The name on the account
was "Edgar Hernandez."

5.   <u>May 29, 2021 Border Crossing of the SUBJECT
VEHILCE</u>

43.   On May 29,2021, I reviewed border crossing information
for the SUBJECT VEHICLE.  On May 28, 2021, the SUBJECT VEHICLE
crossed the border at the Calexico Port of Entry at
approximately 9:45 p.m.  LEMUS phone pings aligned with this
report.  On May 29, 2021, the SUBJECT VEHICLE crossed back into
the United States at the San Ysidro Border at approximately 3:05
p.m.  The travelers associated with the subject vehicle were
LEMUS and Liliana Rojo.  LEMUS provided his Permanent Residence
Card, which listed his date of birth as May 3, 1998.

6.   <u>May 31, 2021 Walmart Ransom Exchange</u>

44.   On May 31, 2021, Agents conducted surveillance and
followed LEMUS and MARTINEZ, who were in the SUBJECT VEHICLE,
and saw them pick up the third individual, J.M.

45.     Thereafter, agents followed LEMUS, MARTINEZ, and J.M. to a Walmart/Lowes located at 8500 Washington Blvd, Pico Rivera, California.  Agents saw J.M. exit the SUBJECT VEHICLE and walk into the Lowes.  Inside the Lowes, J.M. appeared to be waiting to meet someone, but eventually left the store without making a purchase and went back to the SUBJECT VEHICLE.  MARTINEZ then went by the Lowes, continued to a Subway, where he purchased a water bottle, then went into Lowes also looking like he was trying to find someone.  MARTINEZ then went back to the SUBJECT VEHICLE.  LEMUS then went inside Lowes and wandered around the store is if trying to locate an individual.  He was also on his phone during this time and he did not purchase anything.  He asked an associate where the restroom was located, proceeded to the back of the store, turned around, and exited the store to return to the SUBJECT VEHICLE.  The SUBJECT VEHICLE left the store and returned back to a residence.  Based off these actions, as well as my knowledge of this investigation, I believe that LEMUS, MARTINEZ, and J.W. were trying to meet a victim to receive ransom money.  Their behavior aligned with other ransom money exchanges.

46.     Later on May 31, 2021, agents continued surveillance and followed LEMUS and MARTINEZ from the residence to the same Walmart in Southgate that was the location of the April 20, 2021 exchange.  Agents observed LEMUS exit the SUBJECT VEHICLE in the Walmart parking lot and enter the Walmart, while MARTINEZ stayed in the vehicle.  LEMUS went to the electronics section where he met with an individual victim.  This victim handed LEMUS a white

plastic bag.  Based off all previous exchanges, I believe that there was money in this bag.  LEMUS then went to the restroom in the Walmart with the plastic bag and when he exited the bathroom, the plastic bag was no longer visible.  LEMUS was on his phone intermittently while he was inside Walmart.  LEMUS then returned to the SUBJECT VEHICLE where MARTINEZ was waiting for him.  LEMUS drove the SUBJECT VEHICLE, with MARTINEZ as a passenger, back to a residence.

47.  Following this incident, agents interviewed the individual who met with LEMUS inside the Walmart.  This individual, however, appeared to be too afraid to discuss the situation.  A family member of this individual said they were waiting for their daughter who was not answering her phone but was inside Walmart.

## V.  REQUESTED ORDERS REGARDING TRACKING DEVICE

**A.    Installation of Tracking Device and Access to SUBJECT VEHICLE During Monitoring Period If Repairs, Maintenance, and Replacement of the GPS Tracker Become Necessary**

48.  Pursuant to Federal Rule of Criminal Procedure 41(b)(4), I request permission to install a GPS tracking device on the SUBJECT VEHICLE and to track the SUBJECT VEHICLE within and outside of this district.  Although the SUBJECT VEHICLE will likely travel outside of the Central District of California, the installation of the tracking device will occur only when the SUBJECT VEHICLE is within the Central District of California.

49.   Based on my training and experience, GPS tracking devices can require repair, replacement, or other maintenance during a prescribed monitoring period.  If such repair, replacement, or maintenance becomes required, it will become necessary to enter the SUBJECT VEHICLE during the monitoring period solely and exclusively to repair or maintain the GPS tracking device.  Because the SUBJECT VEHICLE may park in a driveway and on other private property, it may be necessary to enter onto private property and/or move the SUBJECT VEHICLE in order to effect the installation, repair and maintenance, replacement, and removal of the tracking device.  If agents access the SUBJECT VEHICLE during the monitoring period to install, repair, replace, or maintain the GPS tracking device and see drugs or other contraband, agents will not seize the items without further search warrant.

**B.   Night Service**

50.   Based on my training and experience, I know that the safest and most advantageous time to install, repair, replace, or maintain a GPS tracker on a vehicle is often late at night, between the hours of 10:00 p.m. and 6:00 a.m., due to the fact that targets of the investigation and any nearby associates are less likely to detect officers attempting to place the tracker on the car.  If targets of the investigation detect agents attempting to place, repair, replace, or maintain the tracker on the SUBJECT VEHICLE, it will very likely compromise the investigation and could put the agents and others at risk.  Therefore, I request night service authorization in order to

install the tracking device on the SUBJECT VEHICLE at night and to repair, replace, or maintain the tracker on the SUBJECT VEHICLE at night, if necessary.

### C.   Delayed Notice

51.   Pursuant to Fed. R. Crim. P. 41(f)(2)(c), (f)(3), and 18 U.S.C. § 3103a, I also request permission to delay service of the warrant on the owner of the SUBJECT VEHICLE for a period of 30 days beyond the end of the disclosure period.  Based on my training and experience, and my investigation of this matter, I believe that reasonable cause exists to delay service of the warrant for a period of 30 days beyond the end of the disclosure period, because immediate notification of the warrant is likely to have the adverse result of placing the investigation in serious jeopardy.  The investigation is ongoing, and providing immediate notification of the warrant may cause the Targets, and other co-conspirators to change their methods of operation, destroy evidence, and/or flee.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

52.   Digital devices seized from MARTINEZ and/or LEMUS are likely to contain evidence of the SUBJECT OFFENSES. Specifically, such devices may show MARTINEZ and/or LEMUS coordinating the ransom pick-ups and discussing further drops of the proceeds to conspirators.  Individuals involved in the SUBJECT OFFENSES frequently use digital devices to communicate with co-conspirators and coordinate the conspiracy.  In addition, such devices may also contain evidence of MARTINEZ and

LEMUS's other associations and contacts, which may reveal their relationships with co-conspirators, known and unknown.

53.  Based on my training and experience, individuals involved in criminal conduct frequently takes photographs of themselves with currency.  Such photographs here, around the time of the conspiracy, would help prove MARTINEZ and LEMUS received proceeds from these kidnappings and the dates of such ransom pick-ups.

54.  Digital devices are also likely to contain evidence of MARTINEZ and LEMUS's whereabouts during the duration of the conspiracy.  Such information can including geotagged photographs, photographs that depict visible landmarks, messages and communications regarding plans or meeting locations, or IP addresses used at specific times.

55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

     a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

56.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

57.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LEMUS and MARTINEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of LEMUS and MARTINEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VII.  <u>CONCLUSION</u>

58.  Based on the foregoing, there is probable cause to believe that LEMUS and MARTINEZ, committed a violation of 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) and that evidence of the SUBJECT OFFENSES will be found in the SUBJECT VEHICLE and on the persons of LEMUS and MARTINEZ.  Further, based on the above facts, there is probable cause to believe that information concerning the movements of the Target Vehicle will provide evidence of violations of STATUTES.

/s/
_____
Caitlin Bowdler
Special Agent, FBI

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>1st</u> day of
<u>June</u> , 2021.

United States Magistrate Judge

## <u>ATTACHMENT A-1</u>

<u>VEHICLE TO BE SEARCHED</u>

A 2002 Ford Truck with California license plate 46428L1, VIN 1FTRW07622KD61463 (the "SUBJECT VEHICLE").

**ATTACHMENT A-2**

<u>PERSON TO BE SEARCHED</u>

The person of EDGAR ADRIAN HERNANDEZ LEMUS ("LEMUS"), date of birth May 3, 1998, with California Driver's License Number Y5718464.

The search of LEMUS shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within LEMUS' immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.

**ATTACHMENT A-3**

<u>PERSON TO BE SEARCHED</u>

The person of FRANCISCO JAVIER HERNANDEZ MARTINEZ ("MARTINEZ"), date of birth August 1, 2000.

The search of LEMUS shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within MARTINEZ's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1956(h) (Money Laundering Conspiracy); 18 U.S.C. § 1951 (Hobbs Act Extortion conspiracy); and 18 U.S.C. § 1203 (Hostage Taking Conspiracy) (the "SUBJECT OFFENSES"), namely:

   a.   United States or Mexican currency greater than $10,000;

   b.   Any articles of clothing that were worn during the ransom exchanges, hats, t-shirts, jackets, and shoes consistent with what was observed during surveillance and on surveillance, including a DKNY t-shirt (worn by LEMUS), a black t-shirt worn with a white rectangle on the front (worn by MARTINEZ), red sneakers (worn by LEMUS), and a black zippered jacket (worn by LEMUS).

   c.   Envelopes, bags, or other means of storage for cash;

   d.   Images of victims;

   e.   Images of cash;

   f.   Receipts from money transfers;

   g.   Travel records;

   h.   Communications and/or records regarding kidnapped victims;

   i.   Communications and/or records regarding meetings to pick up ransom payments;

j.    Communications and/or records regarding transferring of ransom payments;

k.    Communications regarding firearms;

l.    Evidence of ownership and/or use of a 2002 Ford Truck with California license plate 46428L1, VIN 1FTRW07622KD61463;

m.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

n.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

4

    v. evidence of the times the device was used;

    vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    viii. records of or information about Internet Protocol addresses used by the device;

    ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

  3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony

PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress the suspect's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific

finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the suspect's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.